# IN THE COURT OF APPEALS OF IOWA

————————————

No. 26-0064
Filed April 1, 2026

————————————

**In the Interest of J.B. and J.B., Jr., Minor Children,**

**S.H., Mother,**
Appellant.

————————————

Appeal from the Iowa District Court for Floyd County,
The Honorable Elizabeth Batey, Judge.

————————————

**AFFIRMED**

————————————

Matthew B. De Jong of De Jong Law Firm P.C., Rochester, Minnesota,
attorney for appellant mother.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney
General, attorneys for appellee State.

Danielle Ellingson of Noah, Smith, Sloter & Ellingson P.L.C., Charles City,
attorney and guardian ad litem for minor children.

————————————

Considered without oral argument
by Ahlers, P.J., and Buller and Sandy, JJ.
Opinion by Ahlers, P.J.

**AHLERS, Presiding Judge.**

The juvenile court adjudicated two children to be children in need of assistance (CINA). As part of the adjudicatory order and subsequent dispositional order, the juvenile court suspended visits between the mother and the children pursuant to Iowa Code section 232.102A(2) (2025), finding interactions between the mother and children would pose a serious risk of emotional harm to the children. The mother appeals, challenging the suspension of her visits with the children.

Before addressing the merits of the mother's claim, we first detail the events that led to the children's adjudication as CINA.

A bystander noticed a young child alone at a grocery store one morning. Police were notified and arrived to help the seven-year-old boy.[1] They learned that he had been with his nine-year-old sister but could no longer find her. When they took the boy to his home, his mother's wife yelled at the child. She then became upset with the police officers and told them to leave and take the child with them. On the way to the police station, they found the sister walking alone.

Once at the police station, the children revealed that they were not allowed to be at their home during the day—typically leaving around seven or eight o'clock in the morning and not returning until seven or eight o'clock at night. They would not be given any breakfast before having to leave the home. They explained that they would find free popcorn at retail stores or would ask strangers for money to get food during the day. When at home, they would often be left to share a packet of ramen noodles for sustenance for the entire day. This was a frequent form of punishment for the children for

---

[1] This boy and his older sister are the children who are the subject of this case.

wetting the bed, arriving home too late, or having an attitude. The older child would often vomit, sometimes more than once a day, after eating the ramen due to her dislike of the food and how often they were "put on noodles," as the children called the punishment. Meanwhile the mother and her wife would eat "real meals." The boy would later disclose to a foster parent that at times the children would go through the trash to eat scraps of food discarded by the mother and her wife.

When a child protective worker from the Iowa Department of Health and Human Services asked the boy if he was safe in the family home, he disclosed that the mother and her wife would whip him with an electrical cord from a gaming system, which left distinctive markings on his body. The boy later told another worker that the mother would sometimes heat the electrical cord by soaking it in boiling water before whipping him. The boy's report was corroborated by the marks on his body. The sister said she was hit in the same manner, and she had similar markings on her body. The children also explained that their mother would hit them with a hanger. During their interactions with the protective worker, "the children demonstrated fear of returning to the care of their mom and stepmom."

Initially, the children were removed from the family home and placed in foster care. But following an approved, expedited Interstate Compact on the Placement of Children investigation, the children were placed with their father in Michigan. As a worker drove the children to meet the father, they passed by a sign for Waterloo—a town the children associate with the mother because the mother lived there. The children expressed anxiety about being in the same town as their mother, and the worker "had to continuously let them know that [they] were not going to stop unless it was a red light or stop sign." The children would ask each time they passed a building if their

3

mother lived there, and the worker had to reassure them that they were safe in her car.

With these facts in mind, we turn to the mother's challenge to the juvenile court's decision to suspend her visits with the children. "Visitation between a parent and child is an important ingredient to the goal of reunification. However, the nature and extent of visitation is always controlled by the best interests of the child. This standard may warrant limited parental visitation." *In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996) (internal citations omitted). Visits may be suspended only when there is substantial evidence that the visits "would pose a serious risk of physical or emotional harm to the child." Iowa Code § 232.102A(2).

Following our de novo review of the record,[2] we agree with the juvenile court that suspension of the mother's visits with the children was necessary because the visits pose a serious risk of emotional harm to the children at this time. The mother psychologically and physically abused the children when they were in her custody. She withheld food from them to the point they both suffered from protein malnutrition but would eat full meals in front of them. And she would beat them with various objects, including an electrical cord heated in boiling water. The children are terrified of the mother. That was evident to the case workers when the children disclosed the abuse. And the extent of the children's fear was put in sharp focus when they drove by the sign for Waterloo. The mere thought that their mother could be nearby put the children on high alert and made them fearful. Moreover, we note there are no-contact orders between the mother and children in related criminal proceedings. While that is not dispositive as to what visitation limitations

---

[2] We review challenges to the CINA proceedings de novo. *M.B.*, 553 N.W.2d at 344.

4

should be imposed in the CINA cases, the imposition of the no-contact orders underscores the inherent risk to these children should they have contact with the mother.[3]

Because the children were only briefly placed in foster care and have recently been placed in their father's care in Michigan, they have yet to begin therapy. But the father understands their therapeutic needs are immediate, and he is working diligently to get the children a therapist. Once the children have had a chance to participate in therapy to address the abuse and their fear of their mother, then the children may have the tools to safely interact with her. But before then, we agree with the juvenile court that visits with the mother pose a serious risk of emotional harm to them.

The mother complains that "[t]here are no specific findings relating to the suspending of interactions between [herself] and her children." But our review of the transcripts and the dispositional order reveals the basis for the court's suspension of visits and that the court made the findings required by section 232.102A(2). We are not persuaded by the mother's claim that "[n]o party called the children's therapist to substantiate the suspension of parent child interactions." As previously noted, the children have not yet begun therapy, so there was no therapist to testify. And, in this instance, we do not find such testimony necessary to conclude that contact with the mother would be emotionally damaging for the children.

Finally, the mother contends that the juvenile court did not consider a less restrictive alternative than suspension of visits. But her contention is not

---

[3] Because the mother is prohibited from having contact with the children due to the no-contact order in her criminal case, we question whether the mother's challenge in this case is ripe for determination. We have chosen to assume without deciding that it is and proceed to address the merits of her challenge.

supported by the record. It is clear that the juvenile court contemplated less restrictive options when it asked the parties about the mother potentially sending letters to the children if vetted by a therapist or how contact could occur should the criminal no-contact order be lifted. It is also clear that the court is considering how it can move toward contact with the mother once a therapist becomes involved to help the children with their trauma.

Following our review, we see no basis to reverse the juvenile court's suspension of visits at this time. However, we emphasize the children's need for therapy for their own healing and so they can eventually engage in visits with the mother if it is determined that such contact can safely occur.

**AFFIRMED.**